**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

QUIQ CAPITAL LLC., a Delaware limited liability company,

*Plaintiff*,

v.

US ATM ASI, LLC., a Delaware limited liability company; PETER S. HANDY, an individual; ROBERT APPEL, an individual; PAUL SCOTT, an individual; and NEIL SCOTT, an individual, *et al.*,

*Defendants*.

Civil Action No. 25-16908

**OPINION**

September 18, 2026

**SEMPER**, District Judge.

**THIS MATTER** comes before the Court upon a Motion to Dismiss filed by Defendants Neil and Paul Scott (collectively, "Defendants") for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(2). (*See* ECF 19, "Motion" or "Mot.") Defendants filed the present Motion on January 15, 2026. (*Id.*) Plaintiff QUIQ Capital LLC ("Plaintiff" or "QUIQ") filed a brief in opposition to Defendants' Motion on January 29, 2026. (*See* ECF 20, "Opposition" or "Opp.") Defendants filed a reply brief in support of their Motion on February 9, 2026. (*See* ECF 23, "Reply.") On September 4, 2026, this Court ordered Plaintiff to submit a supplemental brief in support of its Opposition and granted Defendants leave to file a supplemental reply. (*See* ECF 45.) Plaintiff submitted its supplemental brief on September 9, 2026. (*See* ECF 46, "Plaintiff's Brief" or "Pl. Br.") Defendants filed their supplemental reply on September 14, 2026. (*See* ECF 47, "Defendants' Brief" or "Defs. Br.") This matter was decided by the Court

upon the submissions of the parties, without oral argument pursuant to Rule 78 and Local Civil Rule 78.1. For the reasons discussed below, Defendants' Motion to Dismiss is hereby **GRANTED** and Plaintiff's claims against Defendants are **DISMISSED** without prejudice for lack of personal jurisdiction.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

The present controversy is derived from a Stock Purchase Agreement formed between Defendants, the former owners of an Ohio-based company called ATM Solutions, Inc. ("ATM Solutions") and US ATM ASI, LLC ("ASI"), a company also based in Ohio. (Mot. at 2; Compl. ¶ 5.) Paul Scott is a resident of Ohio, while Neil Scott is a resident of Kentucky. (Compl. ¶¶ 8, 9.) In February 2023, the two companies agreed that Defendants would sell all of their stock in ATM Solutions to ASI for the sum of $20 million. (Mot. at 2.) ASI agreed to tender payment of $13 million towards the purchase price. (*Id.*) To fully finance the purchase, ASI sought a loan of $7 million from Plaintiff, a New Jersey-based corporation. (Compl. ¶¶ 4, 11.) Plaintiff engaged in a due diligence process prior to executing the loan, which included reviewing and receiving documents "related to ATM Solutions, Inc. and included financial records, the Stock Purchase Agreement, and other documents." (*Id.* ¶ 13.)

After completing its due diligence, Plaintiff entered into a loan agreement with ASI whereby Plaintiff loaned ASI $5,500,000 on February 28, 2023. (*See id.* ¶ 14; Exhibit B.) That same day, Plaintiff formed a second loan agreement with ASI, this time loaning ASI $1,000,000. (*See* Compl. ¶ 15; Exhibit C.) In total, Plaintiff provided ASI with $6,500,000 of funding towards

[1] The facts and procedural history are drawn from the Motion to Dismiss (Mot.), Opposition (Opp.), Complaint (Compl.), and documents integral to or relied upon by the Complaint. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). For the purposes of a motion to dismiss, the facts drawn from the Complaint are accepted as true. *See Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004).

the stock purchase. (Compl. ¶ 16.) Notably, the agreement between Plaintiff and ASI required ASI to provide $500,000 of its own capital as equity contribution or downpayment to cover the remaining balance of $7 million. (*Id.* ¶ 17.)

Despite securing funding from Plaintiff, ASI failed to pay Defendants the full purchase price, instead paying only $6,400,000. (Mot. at 2.) In light of ASI's failure to pay, Defendants filed a lawsuit against ASI in both Ohio state and federal court to recover the remainder of the purchase price. (*Id.*) Defendants claim that until the initiation of the Ohio litigation, they were not aware of Plaintiff's existence, or of its involvement in providing funding to ASI to realize the Stock Purchase Agreement. (*Id.*) Defendants emphasize that they had no contact with Plaintiff, did not send Plaintiff any documentation in their personal capacity, and had no contact with the State of New Jersey at any point during the formation or execution of the Stock Purchase Agreement. (*Id.* at 2-3.)

Plaintiff contends there is more to the story than Defendants suggest. Specifically, Plaintiff claims that it received documentation about ATM Solutions through Defendants' attorney prior to the execution of the loans to ASI. (Opp. at 2.) Plaintiff further alleges the shared documents contained false or misleading information designed to induce it into providing funding for the purchase to proceed. (*Id.*) Plaintiff also alleges that Defendants were aware of ASI's inability to pay, and formed a "Side Agreement" with ASI "in an effort to salvage the deal and get their over $6 million from QUIQ" which entailed Defendants loaning $500,000 to ASI. (*Id.*) The "Side Agreement" was allegedly shielded from QUIQ because Defendants and ASI knew that by not providing a downpayment from its own capital, QUIQ was under no obligation to provide the funds that ultimately went to Defendants. (*Id.* at 2-3.)

Plaintiff brought this action against Defendants on October 24, 2025. (*See generally* Compl.) Plaintiff alleges one count of negligent misrepresentation (Count III) and one count of intentional misrepresentation (Count IV) against Defendants specifically. (*See id.*) Defendants filed a Motion to Dismiss for lack of personal jurisdiction on January 15, 2026. (*See* Mot.) Plaintiff filed a brief in opposition to Defendant's Motion on January 29, 2026. (*See* Opp.) Defendants filed a reply brief in support of the Motion on February 9, 2026. (*See* Reply.) On September 4, 2026, this Court ordered Plaintiff to submit a supplemental brief "clarifying (1) how the documents containing the alleged misrepresentations were delivered to QUIQ Capital, LLC, and (2) case law supporting its position that the alleged sharing supports the exercise of personal jurisdiction over Defendants Paul Scott and Neil Scott." (ECF 45.) This Order was issued due to Plaintiff's vague statements made in its filings to this Court.[2] Plaintiff timely filed a supplemental brief in compliance with the Court's Order on September 9, 2026. (*See* Pl. Br.) Defendants timely filed a supplemental reply brief on September 14, 2026. (*See* Defs. Br.)

[2] In the Complaint, Plaintiff claims that it "asked for and received several documents *from Paul Scott and Neil Scott*, as the sellers of the stocks." (Compl. ¶ 13 (emphasis added)). The Complaint later alleges that "both Paul Scott and Neil Scott, *through their counsel*" made representations orally and in writing regarding the licensing and qualifications of ATM Solutions reflected in Financial Statements "*provided to Plaintiff by Paul Scott, Neil Scott, and/or ATM Solutions, Inc*." (*Id.* ¶ 35 (emphasis added).) The Complaint further alleges that "Defendants Paul Scott [and] Neil Scott . . . misrepresented to Plaintiff about the amount of equity contribution or downpayment that ASI made" and that the Defendants made representations "as themselves and/or through their counsel[.]" (*Id.* ¶¶ 37, 41.) Plaintiff did not attribute specific statements to the Scotts or any Defendants in the Complaint. In its Opposition, Plaintiff appears to abandon the suggestion that Defendants made any direct statements to QUIQ. Plaintiff maintained the argument that "the Scotts *through their counsel*" provided documents and made representations to QUIQ. (Opp. at 2 (emphasis added)). At no point in the Opposition did Plaintiff clarify whether the "counsel" referred to in the pleadings represented the Scotts in their personal capacity or ATM Solutions as a corporate entity. Regardless, Plaintiff's Opposition was devoid of case law supporting its argument that the alleged sharing of documents by counsel satisfied the constitutional requirements of personal jurisdiction. (*See generally* Opp.)

## II. LEGAL STANDARD

It is well-established that courts must have personal jurisdiction over the parties in order to resolve a matter. *Lightfoot v. Cendant Mortg. Corp.*, 580 U.S. 82, 95 (2017). A federal court's exercise of personal jurisdiction is governed by state law. Fed. R. Civ. P. 4(k)(1)(A). Because this federal court sits in New Jersey, New Jersey state law controls the Court's exercise of personal jurisdiction. *See id.*; *see also Boyd v. Arizona*, 469 F. App'x 92, 97 (3d Cir. 2012); *Belt v. Fed. Bureau of Prisons*, 336 F. Supp. 3d 428, 433-34 (D.N.J. 2018). "New Jersey provides for jurisdiction coextensive with constitutional due process." *Salerno Med. Assocs., LLP v. Riverside Med. Mgmt., LLC*, 542 F. Supp. 3d 268, 275 (D.N.J. 2021).

The Due Process Clause of the Fifth Amendment, which applies to federal courts, requires a defendant's contacts in a forum to be "continuous and systematic" for a federal court to exercise general jurisdiction. *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 n.1 (3d Cir. 2002). When a plaintiff's cause of action originates from a defendant's contacts with the forum, a federal court may instead exercise specific jurisdiction. *Id.* at 368.

To exercise specific jurisdiction, the defendant must have sufficient contacts that are "purposefully directed" at the forum state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). The foreseeability of harm occurring in a forum alone is an insufficient basis for a court to exercise specific jurisdiction. *Id.* at 474. Nor is the "unilateral activity of another party or a third person" sufficient to establish specific jurisdiction. *Al-Ghena Int'l Corp. v. Radwan*, 957 F. Supp. 2d 511, 531 (D.N.J. 2013) (quoting *Burger King Corp.*, 471 U.S. at 475).

The decision to subject a defendant to the court's jurisdiction must also satisfy "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Courts use several factors to determine whether this standard is satisfied, including: "(1)

the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering substantive social policies." *MaxLite, Inc. v. ATG Elecs., Inc.*, 193 F. Supp. 3d 371, 391 (D.N.J. 2016) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)). It is the plaintiff's burden to establish that personal jurisdiction over a defendant is warranted. *Id.* at 382. If the plaintiff satisfies their burden, the burden shifts to the defendant to demonstrate that the court's exercise of jurisdiction over them "would render jurisdiction unreasonable." *Id.* at 383 (citation omitted).

Since Plaintiff alleges an intentional tort claim against Defendants, the *Calder* test will be applied as well as the traditional analysis.[3] "[U]nder *Calder* an intentional tort directed at the plaintiff and having sufficient impact upon it in the forum may suffice to enhance otherwise insufficient contacts with the forum such that the 'minimum contacts' prong of the Due Process test is satisfied." *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 260 (3d Cir. 1998). A Court's analysis under *Calder* examines whether a plaintiff has plead facts showing: "(1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum; and (3) the defendant expressly aimed his tortious conduct at the forum." *Hasson*, 114 F.4th at 187.

## III. ANALYSIS

The central question before the Court is whether Defendants have sufficient contacts with New Jersey so that the exercise of personal jurisdiction over them is consistent with the Due Process Clause of the Fifth Amendment.

---

[3] The Third Circuit has clarified that the "effects" test articulated in *Calder v. Jones*, 465 U.S. 783 (1984), while usually reserved to assess personal jurisdiction over intentional tortfeasors, also applies outside of that context. *See Hasson v. FullStory, Inc.*, 114 F.4th 181, 189 (3d Cir. 2024).

Defendants argue that this question must be answered in the negative, because they claim to have never conducted or advertised any business in New Jersey in their personal capacity. (Mot. at 2.) Defendants also argue that this Court cannot exercise jurisdiction over them based on contracts between ASI and QUIQ, which they are not a party to, (*id.*), or documents provided to QUIQ, even if those documents contain business records from ATM Solutions. (*Id.* at 3, 6.) Furthermore, Defendants claim in their sworn declarations that they were not aware that QUIQ financed ASI's purchase and they did not know of the existence of QUIQ until the commencement of the Ohio litigation. (ECF 19-3 ¶ 4; ECF 19-4 ¶ 4.)

On the other hand, Plaintiff argues that specific jurisdiction over Defendants is proper due to Defendant's "intentional involvement in the sale of their company" and their receipt of "over $6 million as part of this transaction." (Opp. at 3-4.) Plaintiff emphasizes that Defendants entered into a Stock Purchase Agreement with ASI in order for the transaction to occur, and the Stock Purchase Agreement contains language obligating the seller of the stock to review agreements between the buyer and the buyer's lender.[4] Plaintiff argues that a diligent review of its loan agreements with ASI was a required condition for the stock transaction to occur in the first place. (Opp. at 5.) Therefore, Plaintiff argues that Defendants' claim they did not know of the existence of QUIQ must be false, and the decision to proceed with the transaction means Defendants were satisfied with the loan agreements. (*Id.*) Furthermore, Plaintiff highlights that Defendants' knowledge of QUIQ before the Ohio litigation is proven by a signed closing statement "indicating

[4] In relevant part, the Stock Purchase Agreement states: "Sellers shall have completed their due diligence investigation of Buyer and shall, in their sole discretion, be satisfied with the results of their due diligence investigation. Sellers' due diligence investigation of Buyer shall consist of *a review of any agreements (or the relevant portions thereof) between the Buyer's senior lender, on the one hand, and Buyer* or one or more Guarantors, on the other, which may affect Buyer's ability to make payments under the Note." (ECF 20-1, "Declaration of Matthiew Mendonca" or "Mendonca Dec.," Exhibit A Section 7.03(a) (emphasis added).)

that the Scotts were scheduled to receive and did receive $6,307,826 from QUIQ." (*Id.* at 6.) In Plaintiff's view, these documents prove that "the Scotts purposefully accepted over $6 million from QUIQ … knowing that QUIQ has a principal place of business within this judicial district since the Loan Agreements expressly state as such … [and] the Scotts understood that any issues with said specific transaction would be raised within this judicial district." (*Id.*) In other words, Plaintiff argues that Defendants receipt of funds from QUIQ, contractual obligations, and documents shared to QUIQ satisfies the purposeful availment and minimum contacts tests required for personal jurisdiction.

**A. Traditional Personal Jurisdiction Analysis**

1. <u>Defendants Lack Sufficient Contacts with the State of New Jersey</u>

The Court is not persuaded that Plaintiff has established a *prima facie* case that Defendants are subject to the Court's jurisdiction. *See O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 316 (3d Cir. 2007) ("Once challenged, the plaintiff bears the burden of establishing personal jurisdiction."). The parties devote a significant portion of their arguments to the question of whether Defendants knew of the existence of QUIQ. However, Plaintiff has cited no case suggesting that Defendants' alleged knowledge "is a constitutionally adequate substitute for a defendant's intentional contacts with the forum state." *Quten Rsch. Inst., LLC v. BioThrive Scis., LLC*, No. 19-15432, 2021 WL 2458225, at *3 (D.N.J. Apr. 22, 2021) (holding a defendant's knowledge of a plaintiff's citizenship alone is insufficient to establish personal jurisdiction). In fact, Plaintiff cited no case law in its Opposition that supports its position. (*See generally* Opp.) The Court therefore views the discussion of whether Defendants knew of QUIQ as having limited relevance to the analysis of Defendants' contacts in New Jersey.

After evaluating Defendants' actual contacts with the State, the Court finds that Defendants did not purposefully avail themselves of doing business in New Jersey. QUIQ was only involved in the stock purchase transaction because ASI entered into two loan agreements with QUIQ. (Compl. ¶¶ 14-15, 39.) It is well-established that a defendant cannot be haled to court in a jurisdiction due to the "unilateral activity of another party or a third person." *Burger King Corp.*, 471 U.S. at 475 ("[The] purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts . . . or of the unilateral activity of another party or a third person." (quotations omitted)). The Court in *Burger King* went on to note that jurisdiction is proper where the defendant has "deliberately . . . engaged in significant activities within a State" because in such an instance, he has privileged himself of conducting business in the State and he is shielded by "the benefits and protections of the forum's laws." *Id.* at 475-76 (quotations omitted).

Here, there is no evidence that Defendants deliberately engaged in significant activities in New Jersey or benefited from the protection of New Jersey's laws. The connections between the Defendants and the State of New Jersey that Plaintiff draws, such as Defendants' receipt of over $6 million, documents about Defendants' former company flowing into New Jersey, or the requirement to review agreements made between plaintiff and a third party are too "attenuated" for the Court to find purposeful availment in this instance. "Jurisdiction is proper … where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum state." *Burger King Corp.*, 471 U.S. at 475. To be sure, if ASI chose to enter into a loan agreement with a company based in Virginia, for example, Defendants would have engaged in the same conduct and would not have even tangentially targeted New Jersey's business economy. *See Walden*, 571 U.S. at 285 ("[T]he plaintiff cannot be the only link between

the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State."); *see also Ferguson v. Aon Risk Servs. Cos., Inc.*, No. 19-9303, 2020 WL 914702, at *7 (D.N.J. Feb. 26, 2020) ("Aon's contacts with New Jersey are fortuitous and do not stem from deliberate targeting of New Jersey, but rather, Raydon's unilateral choice in clients."). Accordingly, The Court finds that Defendants' business relationship with this forum stems from the acts of ASI as a third party and does not constitute purposeful availment establishing personal jurisdiction.

Defendants' receipt of $6 million is also insufficient to establish personal jurisdiction in this forum. The funds accepted by Defendants were received through ASI, making Defendants' connection to New Jersey through that transaction even more remote—Plaintiff has cited no case where this Court has exercised specific jurisdiction over a defendant based on funds they received from a third-party who is not a resident of New Jersey, simply because the third party received the funds from a New Jersey entity. In contrast, this Court has exercised specific jurisdiction where the *borrower* entered into a contract with a New Jersey corporation after directing solicitations for loans in the State. *See Fox v. Dream Tr.*, 743 F. Supp. 2d 389, 395 (D.N.J. 2010) ("Defendants knew they were making a deal with a resident of New Jersey, and so the Court has personal jurisdiction over Defendants with respect to Plaintiff's state law claims concerning that deal.").

However, this is not to say that entering into a contract with a New Jersey corporation automatically provides a basis for specific jurisdiction. Even if Defendants directly engaged in a contract with Plaintiff, more would need to be shown to establish personal jurisdiction because "[t]he mere existence of a contract is insufficient to establish minimum contacts." *Budget Blinds, Inc. v. White*, 536 F.3d 244, 261 (3d Cir. 2008). The Court in *Burger King* specifically held that the existence of a "contract with an out-of-state party *alone*" does not "automatically establish

sufficient minimum contacts in the other party's home forum." 471 U.S. at 478. Rather than relying on mechanical tests, the Supreme Court of the United States instructed lower courts to look at the context of the agreement, such as prior negotiations, contemplated future consequences, the terms of the contract, and the parties' actual course of dealing to determine whether sufficient minimum contacts have been made. *Id.* at 479. Unlike the respondent in *Burger King*, Defendants did not deliberately reach into the forum state to form a contract expecting to establish a long-lasting business relationship. *Id.* The *Burger King* Court held that because the contract between the respondent and the petitioner established a 20-year business deal, the respondent's contacts with the forum state could not be considered random, fortuitous, or attenuated. *Id.* at 480 (quotations omitted).

Here, Plaintiff does not claim that Defendants intended to engage in a long-term business relationship with them or another entity in New Jersey. Defendants claim they have never been in contact with QUIQ, and Plaintiff does not reference any negotiations prior to the formation of the loan agreements for this Court to evaluate. (Mot. at 2-3.) *Cf. Fox*, 743 F. Supp. 2d at 395 ("Defendants . . . knew that their representations were being communicated to Plaintiff in New Jersey *before the loan deal was consummated* because [Plaintiff's daughter] told them so." (emphasis added)). Plaintiff has not presented evidence that future consequences were ever discussed with a representative for Defendants. The relevant contractual terms and the parties' indirect course of dealing present only a strained relationship with New Jersey at best, if any at all.

The facts of this case are similar to *Telesis Mergers & Acquisitions, Inc. v. Atlis Federal Services, Inc.*, 918 F. Supp. 823 (D.N.J. 1996). In *Telesis Mergers & Acquisitions, Inc.*, the plaintiff ("Telesis") was a New Jersey-operated corporation and the defendant ("Atlis") was a Maryland-operated corporation. *Id.* at 825. The parties formed a contract where Telesis agreed to

locate a buyer for a wholly-owned subsidiary of Atlis. *Id.* The retention agreement gave Telesis an exclusive right to make sales offers on behalf of the subsidiary for six months. *Id.* Furthermore, the agreement provided that Telesis would be paid a commission if the subsidiary was sold during the relevant period. *Id.* at 826. During that six-month period, Atlis formed a stock purchase agreement to sell the subsidiary to a third-party corporation, which Telesis was not involved in. *Id.* Telesis filed suit against both Atlis and the wholly owned subsidiary, arguing "[the defendants] knew, and even insisted, that Telesis would perform in New Jersey." *Id.* at 832. The Court held that because the retention agreement was for a one-time purchase, only lasted for six months, and the Defendants had no contacts with New Jersey besides soliciting the services of Atlis, there were insufficient contacts to establish personal jurisdiction. *Id.* at 834-35.

Here, the analysis is even clearer because Defendants did not form any contract with Plaintiff, nor did they solicit their services, because the solicitation was conducted by ASI. (*See* Compl. ¶ 10 ("In or around February 2023, ASI provided Plaintiff and Information Memorandum regarding a loan for $7,000,000.").) Therefore, the Court is convinced that the circumstances surrounding the formation of the Stock Purchase Agreement and loan agreements do not provide a basis for personal jurisdiction under the traditional minimum contacts analysis.

The supplemental briefing confirms that Plaintiff has not established a basis for personal jurisdiction. Plaintiff argues that material misrepresentations were contained in "documents that were uploaded by or on behalf of the Scotts" and such documents "were authored by the Scotts or originated from the Scotts since they relate to the financial health of ATM Solutions, which was privately owned by the Scotts." (Pl. Br. at 2-3.) Plaintiff explains these documents were uploaded into a "virtual data vault named 'Quik Capital Requests[]' . . . by or on behalf of the Scotts." (*Id.* at 3.) Although Plaintiff contends that documents were uploaded into the virtual vault "by or on

behalf of the Scotts," (*see* ECF 46-1 ¶ 7), the exhibits attached to Plaintiff's supplemental brief show that the documents in question were uploaded by individuals named Kandi Pytlicek and Brendan O'Kelly. (*See* ECF 46, Exhibits A, B.) As Plaintiff does not mention these individuals in its supplemental brief, the Court cannot determine which entity these individuals worked for or who they represented. However, these exhibits undermine Plaintiff's contention that documents were uploaded by Defendants themselves. The fact that Paul Scott is listed as the owner of the document (Neil Scott is unmentioned) does not affect the Court's analysis because a third party acted to deliver the documents to the vault. *See Burger King Corp.*, 471 U.S. at 475 (holding the unilateral activity of a third person is insufficient to create sufficient contacts with a forum state).

Furthermore, the fact that Defendants owned ATM Solutions is insufficient to establish personal jurisdiction in this Court, even if jurisdiction could be established over ATM Solutions based on the documents being uploaded into the virtual vault. It is well-established that a court cannot exercise personal jurisdiction over an agent or employee of a company simply because jurisdiction may be appropriate over their employer: "[J]urisdiction over an employee does not automatically follow from jurisdiction over the corporation which employes him[.]" *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 n.13 (1984); *see also Nicholas v. Saul Stone & Co. LLC*, 224 F.3d 179, 184 (3d Cir. 2000) (citing *Keeton*, 465 U.S. at 781); *Busse v. Homebank LLC*, No. 07-3495, 2009 WL 424278, at *4 (D.N.J. Feb. 18, 2009) ("The sole basis for Plaintiffs' claims against Saul is that he managed and controlled Chevy Chase. . . . However, jurisdiction over an individual does not exist simply because he or she is an agent or employee of an organization

which presumably is amenable to jurisdiction in this Court.").[5] Accordingly, it is clear that Plaintiff has failed to allege facts establishing Defendants' minimum contacts in this forum.

2. Fairplay and Substantial Justice Does Not Require the Exercise of Personal Jurisdiction Over the Defendants

The Court now weighs the traditional notions of fair play and substantial justice. *See MaxLite*, 193 F. Supp. 3d at 391. Defendants claim they have never conducted business in New Jersey, (Reply at 1), and have only visited New Jersey on infrequent occasions. (Mot. at 3.) Moreover, pertinent business records related to the Stock Purchase Agreement are likely located in Ohio, since it is the place of business of both ATM Solutions and ASI. (Mot. at 2; Compl. ¶ 5.)

The United States Supreme Court has recognized that the burden of litigating in a different jurisdiction has decreased with advancements in communication and transportation. *See World-Wide Volkswagen Corp.*, 444 U.S. at 286 ("[P]rogress in communications and transportation has made the defense of a suit in a foreign tribunal less burdensome." (quoting *Hanson v. Denckla*, 357 U.S. 235, 250-51 (1958))). However, technological advancements have generally been determined to weigh in favor of exercising personal jurisdiction where the defendant has *some established contacts with the forum state*. *See id.* at 294 ("Even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State … the Due Process Clause, acting as an instrument of federalism, may sometimes act to divest a State

[5] In their supplemental reply brief, Defendants claim that the Quik Capital Requests virtual vault was not created by QUIQ at all, and was instead created by ASI. (*See* Defs. Br. at 2.) This allegation, if true, weakens the analogy Plaintiff makes between the virtual vault and delivering documents to New Jersey, as ASI is an Ohio-based entity incorporated in Delaware. (Compl. ¶ 5.) Furthermore, Defendants informed the Court that all documents that were placed in the Quik Capital Requests vault were derived from a separate virtual vault (the "ATM Solutions Dropbox") created by counsel for Defendants to execute the Stock Purchase Agreement. (Defs. Br. at 2-3.) Defendants claim they did not give Plaintiff access to the ATM Solutions Dropbox, nor did they give ASI or anyone else permission to share documents from the ATM Solutions Dropbox with Plaintiff. (*Id.*)

of its power to render valid judgment."). Defendants' lack of contacts with New Jersey compels the Court to hold a burden would be placed on Defendants if this litigation continued in New Jersey. It is also true that New Jersey has an interest in this matter because harm was experienced by a New Jersey corporation. *See Grand Ent. Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 483 (3d Cir. 1993) ("[S]tates often have a 'manifest interest in providing effective means of redress for its residents.'" (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957))). However, that the State has a valid interest in the matter does not overcome a defendant's lack of contact with the forum. *See World-Wide Volkswagen Corp.*, 444 U.S. at 294 ("[E]ven if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause … [may] divest the State of its power to render valid judgment.").

Furthermore, the fact that litigation arising out of the Stock Purchase Agreement has commenced in Ohio state and federal courts renders Ohio a more efficient forum for this litigation. *See DAG Jewish Directories, Inc. v. Hebrew Eng. Yellow Pages, Inc.*, No. 09-33, 2009 WL 983026, at *5 (D.N.J. Apr. 13, 2009) ("[G]iven the parallel state court litigation ongoing in Georgia, the interstate judicial system's interest in obtaining convenient and effective relief militates heavily in favor of litigating the entire matter in the same state."). The Court holds that the traditional factors of fair play and substantial justice weigh in favor of its conclusion that it lacks personal jurisdiction over Defendants.

**B. *Calder* "Effects" Analysis**

Because Plaintiff alleges one count of intentional misrepresentation in the Complaint, analysis under *Calder* is especially appropriate. *See Miller Yacht Sales, Inc.*, 384 F.3d at 108 (Scirica, J., concurring) ("In *Calder* . . . the Supreme Court set forth an 'effects test' for

determining personal jurisdiction over non-resident defendants who commit intentional torts with effects inside the forum."). As stated above, this test requires the Court to assess whether: "(1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum; and (3) the defendant expressly aimed his tortious conduct at the forum." *Hasson*, 114 F.4th at 187.

Even if Plaintiff were to establish the first two elements, Plaintiff is unable to satisfy the third element of establishing personal jurisdiction under *Calder*. The Third Circuit has held that the express aiming factor cannot be satisfied by "[s]imply asserting that the defendant knew that the plaintiff's principal place of business was located in the forum." *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 265 (3d Cir. 1998). This is exactly the argument that Plaintiff makes: "[T]he Scotts purposefully accepted over $6 million from QUIQ knowing about the Loan Agreements, and knowing that QUIQ has a principal place of business within this judicial district." (Opp. at 6.) "[B]y uploading the documents to the virtual data vault, the documents were expressly aimed at the [S]tate of New Jersey where QUIQ resides." (Pl. Br. at 5-6.) The fact that Defendants knew of the loan agreements and accepted funds from QUIQ does not constitute contact with New Jersey "which demonstrate[s] that the [D]efendant[s] *expressly aimed* its tortious conduct at the forum, and thereby made the forum the focal point of the tortious activity." *See IMO Indus.*, 155 F.3d at 265 (emphasis in original); *Hasson*, 114 F.4th at 196 ("[W]hile a defendant's knowledge that the plaintiff is located in the forum is necessary to the application of *Calder*, that alone is insufficient to satisfy the targeting prong of the effects test." (quoting *IMO Indus.*, 155 F.3d at 266)); *Budget Blinds, Inc.*, 536 F.3d at 264 (rejecting the argument that "the 'expressly aiming' requirement is satisfied when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state"). Plaintiff has not alleged facts

that show that New Jersey was the target of Defendants' allegedly tortious activity, and accordingly fails to meet the *Calder* standard of establishing personal jurisdiction.

## IV. CONCLUSION

For the reasons discussed above, Defendants' Motion to Dismiss (ECF 19) is **GRANTED**. Plaintiff's Complaint (ECF 1) is therefore **DISMISSED** without prejudice, for lack of personal jurisdiction pursuant to Rule 12(b)(2). An appropriate Order follows.

*/s/ Jamel K. Semper*
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig: Clerk
cc: Andre M. Espinosa, U.S.M.J.
Parties